

# Missouri Court of Appeals

## Southern District

### Division Two

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Plaintiff-Respondent, | ) |
| | ) |
| vs. | )    No. SD32125 |
| | ) |
| ANTHONY W. KALTER, | )    **Filed: May 9, 2014** |
| | ) |
| Defendant-Appellant. | ) |

APPEAL FROM THE CIRCUIT COURT OF CARTER COUNTY

Honorable David P. Evans, Circuit Judge

**REVERSED AND REMANDED FOR NEW TRIAL**

In March 2012, a jury found Anthony W. Kalter ("Defendant") guilty of the

misdemeanor crime of sexual misconduct in the second degree for exposing his genitals

under circumstances in which he knew that his conduct was likely to cause affront or alarm.

*See* section 566.093.1(1); .2.[1]  The State alleged that the conduct occurred in Howell County

---

[1] The State's amended information charged Defendant with "the class D felony of sexual misconduct involving a child by indecent exposure" for "knowingly expos[ing] his genitals to A.R. ["Child"] . . . a child less than fifteen . . . years of age, and did so knowing that such conduct was likely to cause affront or alarm to [Child]." *See* section 566.083.  During the instructions conference held at the conclusion of the presentation of evidence in the case, the trial court submitted -- at Defendant's request and without objection by the State -- a verdict-directing instruction on the misdemeanor offense of sexual misconduct in the second degree.  Defendant characterized the misdemeanor as a "lesser included" offense of the felony charged by the State.  No one has challenged on appeal the propriety of the submission, and we therefore express no opinion on the matter.  At the time of the conduct at issue here, section 566.093.1 provided that "[a] person commits the crime of sexual misconduct in the second degree if such person: (1) [e]xposes his or her genitals under circumstances in which he or she knows that his or her conduct is likely to cause affront or alarm[.]"  Section 566.093 was amended in

between May 1, 2010 and August 16, 2010.[2]  Defendant received a sentence of 180 days in the county jail.  The trial court imposed ten days as "shock time[,]" suspended the remaining 170 days, and placed Defendant on a two-year term of probation.[3]

Defendant presents two points on appeal: 1) the evidence was insufficient to prove beyond a reasonable doubt that Defendant "exposed his genitals 'under circumstances in which he knew that such conduct was likely to cause affront or alarm,' because the jury rejected [Child's] testimony about [Defendant's] conduct," Child's mother did not see Defendant "except when she looked towards the doorway of his house," Defendant "never gestured or called out to them or stepped out of his house in their presence," and assuming Defendant's genitals were exposed, "there was no evidence that he knew [his neighbors] could see him from their backyard, or that anybody was likely to be affronted or alarmed by him"; and 2) the trial court "abused its discretion in failing to strike Venireman No. 30 . . . and Venireman No. 31 . . . for cause" because "both [j]urors indicated that they would need [Defendant] to testify before they could find him not guilty," they were not rehabilitated, both served as jurors, and Defendant did not testify.

Although Defendant's conviction was supported by sufficient evidence, he is entitled to relief on his second point.  As a result, we reverse the judgment of conviction and sentence and remand the matter for a new trial.

---

2013 to change the offense to sexual misconduct in the first degree.  The jury convicted Defendant of the misdemeanor and found him not guilty of the felony offense charged by the State.  Unless otherwise indicated, all statutory references are to RSMo Cum. Supp. 2009.
[2] The case was tried in Carter County after a change of venue.
[3] Defendant's notice of appeal timely followed the overruling of his motion for new trial and subsequent sentencing.

*Point I – Sufficiency of the Evidence*

We present the evidence supporting Defendant's conviction in the light most favorable to the jury's verdict, ***State v. Belton***, 153 S.W.3d 307, 309 (Mo. banc 2005), and we have disregarded all evidence and inferences contrary to the verdict. ***State v. Wooden***, 388 S.W.3d 522, 527 (Mo. banc 2013).[4] The purpose of our review is "to determine whether there was sufficient evidence from which a reasonable juror could have found appellant guilty as charged." ***State v. Ervin***, 979 S.W.2d 149, 159 (Mo. banc 1998).

Sometime in late 2009 or early 2010, Defendant moved into a house located near the home of W.R. ("Mother"[5]) and her family. The front of Defendant's house faced the rear of Mother's house. A roadway ran between the two houses, and the distance between Defendant's front door and Mother's back porch was 127 feet. Mother first observed Defendant "in his white underwear. And then he got where he would stand at the door and kind of just peek around the corner, and he would just cup himself." On July 17, 2010, Mother went to her back porch to read, and she saw Defendant come to his doorway while "he was totally nude[.]" Mother was "surprised[.]" Defendant "just kept standing there, staring at [Mother,]" and she estimated that "he probably stood there five or six minutes[.]"

On July 20, 2010, Mother was sitting on her back porch when Defendant came "to the door again with no clothes on, and just stood in the doorway[,]" staring at her. Mother "immediately went in the house[,]" and she found Defendant's behavior "disturbing[.]" On a subsequent occasion, Mother went outside to get one of her cats, and she noticed that Defendant's door was shut. Then, when she came back around the corner of her house, she

---

[4] Any references to evidence contrary to the verdict are made solely to provide background or context for Defendant's arguments.

[5] We refer to Mother by her initials in order to protect the identity of her daughter, Child, whose trial testimony is also referenced in this opinion.

3

saw Defendant "standing in his doorway, totally nude, with his hands spread out to the sides." This "petrified" Mother, and it "scared [her] to death" as she was concerned for her daughters.

Mother called the police after this incident. She did not sign a statement for the police because she "was scared[,]" and she wanted to talk to her husband. Mother said that they installed lattice on their back porch, and she changed the time when she would go outside to feed her cats. But after August 11, 2010, Defendant "continued to do it every time [she] went outside." Mother said that "it seemed like when [she] would open the door, [Defendant] . . . knew it, and he'd come to the door with no clothes on." Defendant had a dog, but he was not "letting a dog out" at the times Mother saw him standing in the doorway staring at her. As long as Mother remained outside, Defendant "would just keep standing there, staring at [her]." Defendant did not stand nude in his doorway when Mother's husband was at home.

Child testified that when she was twelve years old, she saw Defendant standing "at his door" and "he wasn't wearing nothing." She saw this "nine to ten" times while she was outside her house, and some of those occasions occurred between May 1, 2010 and August 16, 2010. Defendant was facing her on these occasions, and it caused Child to feel "scared."

On the morning of August 16, 2010, Thomas Poindexter, a Mountain View police officer, went by Defendant's house. The officer was riding a bicycle, and he was not in uniform. As Officer Poindexter rode by Defendant's house, he saw Defendant "standing . . . in the doorway, obviously nude." The officer did not see a dog in Defendant's yard. The officer stopped his bicycle, and Defendant "stepped back inside[.]" Officer Poindexter "waited a little bit" and then Defendant stuck his head out of his door, "looked over [the

4

officer's] way, went back in, then closed the door."  The officer reported the incident to his "chief[.]"

The Chief of Police for Mountain View, James Perkins, testified that after Officer Poindexter contacted him on August 16, 2010, he went to Mother's residence around 8:00 a.m. and contacted her.  Chief Perkins went outside Mother's house and sat near some pine trees, in line with where Mother was sitting at the time on her porch swing.  Defendant's "door was already open.  [Defendant] stepped in view of the doorway completely naked head to toe[.]"  Defendant "had like a towel in his hand and he was drying something off his hand.  He was there for a short few seconds."  Defendant stepped out of view, and then came back into view.  He appeared to be "staring directly . . . towards [the officer]" as the officer was in line with Mother's porch.  Defendant "stare[d] for a few seconds" before shutting the door.

Chief Perkins went inside Mother's house and spoke with her in her kitchen.  He looked through the kitchen window and saw Defendant "step outside, completely outside, still unclothed, naked."  Defendant went back inside.  Chief Perkins went back outside, and he waited in the same area where he was located when he first saw Defendant.  Defendant's door opened, and Defendant stood "closer to the threshold of the doorway, completely nude[.]"  Defendant did not look around; he looked in the direction of Mother's porch.  Defendant stood "there for ten or fifteen seconds, completely nude," before shutting the door.

Chief Perkins went to Defendant's house and asked to speak with him.  Defendant replied, "Come on in."  Chief Perkins told Defendant that he had received reports of Defendant "standing nude in his doorway, flashing his neighbors[,]" and that he had seen the

5

same behavior.  Defendant stated, "Well, like, I stand there all the time naked.  I let my dog in and out all the time."  Chief Perkins had been at Mother's residence for "approximately 30 minutes" -- during which time he saw Defendant naked four times -- and he did not "see a dog running around" outside, although he later saw a dog inside Defendant's house in a cage.  Chief Perkins placed Defendant under arrest, but he permitted Defendant to go upstairs to comb his hair.  Chief Perkins observed that there was one window upstairs where "you could see right through the window to [Mother's] backyard and to the back porch."

At the police station, Chief Perkins interviewed Defendant after he had signed a form acknowledging that he understood his rights.  Defendant agreed to speak with Chief Perkins, and he "acknowledge[d] that he knew the neighbors had kids next door[.]"  Defendant indicated that he did "this every day, all the time," and he did not think anyone saw him.  Defendant said he put "his head out to make sure there was no one there to see him[.]"  Chief Perkins had not observed any such behavior during the occasions that he saw Defendant step into the doorway nude.  Defendant denied "look[ing] over at the neighbor's house[.]"

Officer Poindexter also interviewed Defendant at the police station after Chief Perkins was finished.  Defendant told the officer that "he had observed the girls from time to time reading and [being] outside feeding their cats."

Defendant contends "the State wholly failed to prove that [he] exposed his genitals under circumstances in which he knew that his conduct was likely to cause affront or alarm[.]"  In reviewing this claim, our "focus . . . is on [Defendant's] knowledge that his behaviors would cause affront or alarm." *State v. Jeffries*, 272 S.W.3d 883, 885 (Mo. App. S.D. 2008).  The State was not required to prove that a particular person "was in fact

6

affronted or alarmed, only that [Defendant] knew that his conduct was likely to cause affront or alarm." *Id.* *See also State v. Brown*, 360 S.W.3d 919, 923-24 (Mo. App. W.D. 2012) (the defendant "*should* have known that his conduct [of masturbating outside his car 'immediately in front of the unobstructed view of windows on a multi-home duplex building'] was likely to cause affront or alarm").

In *State v. Jeffrey*, 400 S.W.3d 303, 305 (Mo. banc 2013), our high court considered the meaning of "affront" or "alarm" in the context of section 566.083. In cases involving the same subject matter, we should consistently interpret these common terms. *Jeffries*, 272 S.W.3d at 884. In *Jeffrey*, the defendant was charged with two instances of exposing himself to a child, and "[t]he jury heard evidence that [the defendant] was standing in front of either his door or window on four separate occasions." 400 S.W.3d at 313. The defendant argued that "he was merely walking from room to room after a shower, and the girls happened to see him nude." *Id.* The Court found that "evidence of repeated incidents of similar conduct undercuts this assertion and allowed the jury to infer that [the defendant] did not mistakenly or accidentally expose himself to the girls." *Id.* at 313-14. Further, as to one of the charged incidents, the defendant "quickly closed the door after he had exposed himself." *Id.* at 314. The court found that while the jury could have inferred that the defendant "was simply closing his door" a reasonable inference would be that the defendant was waiting for the girls to expose himself such that he closed the door when they passed and the Court would "take all reasonable inferences in favor of the verdict." *Id.* As to the defendant's claim that there was insufficient evidence that "he knew that his exposure would cause affront or alarm[,]" *id.* at 314, the Court observed that the exposures happened "in a situation in which one would not ordinarily expect to be confronted by nudity." *Id.* at 315.

7

Here, Defendant first argues that "[s]ince the jury acquitted [Defendant] of this behavior regarding [Child], this leaves only evaluation of [Mother's] claims." We disagree. The jury was entitled to believe some or all of Child's testimony even though it found Defendant not guilty of violating section 566.083.

At the time in question, section 566.083.1(1) provided that

[a] person commits the crime of sexual misconduct involving a child if the person: (1) [k]nowingly exposes his or her genitals to a child less than fifteen years of age under circumstances in which he or she knows that his or her conduct is likely to cause affront or alarm to the child[.]

Even if Defendant did not know that a particular child was likely to be affronted or alarmed, as would be necessary for a conviction under section 566.083.1(1), the jury could still find under section 566.093.1(1) that Defendant "[e]xpose[d] his . . . genitals under circumstances in which he . . . [knew] that his . . . conduct [was] likely to cause affront or alarm[.]" *See State v. Browning*, 357 S.W.3d 229, 233 (Mo. App. S.D. 2012) ("[t]he reliability, credibility, and weight of witness testimony are for the fact-finder to determine, and it is within the fact-finder's province to believe all, some, or none of the witness' testimony"). Thus, the jury could have determined that Child's testimony helped establish that Defendant's actions were not the results of a mistake or accident.

Defendant argues that his "conduct belies any reasonable conclusion . . . that he knowingly exposed his genitals to anyone or that he knew his conduct was likely to cause 'affront or alarm.'" He argues that "[f]rom 127 feet away, it is unclear that [Defendant] would know that anyone was able to see him as he was standing in his doorway[.]" We must reject the argument as it depends upon an inference that is contrary to the verdict. *Belton*, 153 S.W.3d at 309. The applicable inference was that if Mother could see Defendant from her back porch and yard, then Defendant could also see her. As a result, we

8

presume Defendant's open front doorway was in view of his neighbor's house and presented "a situation in which one would not ordinarily expect to be confronted by nudity." *Jeffrey*, 400 S.W.3d at 315.

Defendant admitted that he stood nude in his front doorway "all the time," and he admitted being aware that he had neighbors with children. He told Officer Poindexter that he had seen "the girls from time to time reading and [being] outside feeding their cats." Defendant continued to remain exposed and stare at Mother as long as she remained outside. Chief Perkins corroborated the direction of Defendant's attention when he twice saw Defendant standing nude in the doorway, staring in the direction of Mother's porch. On one occasion when Defendant was facing Mother nude from his doorway, he spread his hands "out to the sides." Defendant did not exhibit this behavior when Mother's husband was around. As in *Jeffrey*, the reasonable inference from Defendant's behavior was that he did not accidentally expose his genitals; instead, he was aware of the circumstances making it likely that his exposure would cause affront or alarm. 400 S.W.3d at 313-14.

The aforementioned evidence was sufficient to allow a reasonable juror to conclude that Defendant "expose[d] his genitals under circumstances in which he . . . [knew] that his . . . conduct [was] likely to cause affront or alarm[.]" Section 566.093.1(1). Point I is denied.

*Point II – Motion to Strike Venirepersons 30 and 31*

"A defendant is entitled to a fair and impartial jury." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006), citing U.S. Const. amends. VI, XIV and Mo. Const. art. 1, sect. 18(a). "To qualify as a juror, a venireperson must be able to enter upon that service with an open mind which is free from bias or prejudice. In order to be struck for cause, a venireperson's beliefs must impair that person's ability to follow the instructions." *State v.*

9

*Plummer*, 860 S.W.2d 340, 348 (Mo. App. E.D. 1993) (citation omitted). "A juror's qualifications are not determined conclusively by a single answer but rather from the entire voir dire examination." *State v. McFadden*, 369 S.W.3d 727, 738 (Mo. banc 2012).

"Because the trial court is in the best position to evaluate the venireperson's commitment to follow the law, it has broad discretion in determining the qualifications of a prospective juror." *State v. Rousan*, 961 S.W.2d 831, 839 (Mo. banc 1998). "Its ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996). "Trial judges should sustain challenges to jurors whose responses make questionable their impartiality." *State v. Stewart*, 692 S.W.2d 295, 299 (Mo. banc 1985). "A trial court should always err 'on the side of caution in ruling on challenges for cause in criminal cases where a replacement can easily be obtained for a prospective juror of doubtful qualifications.'" *State v. Plaster*, 813 S.W.2d 349, 352 (Mo. App. E.D. 1991) (quoting *Stewart*, 692 S.W.2d at 299).

> [W]hen the examination leaves uncertainty about the venireperson's ability to be fair and impartial, the trial court has a duty to make an independent inquiry regarding fitness for jury service. [*State v. Clark-Ramsey*, 88 S.W.3d 484,] 488–89 [(Mo. App. W.D. 2002)]. In such cases, the absence of an independent examination by the trial judge justifies a more searching review by this court of the challenged juror's qualifications.

*State v. Grondman*, 190 S.W.3d 496, 498 (Mo. App. W.D. 2006).

At Defendant's trial, the trial court read the following instruction to the venire before questioning began: "Defendant is presumed to be innocent unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the State the burden of proving beyond a reasonable doubt that [Defendant] is guilty." If a juror was not "firmly convinced of [Defendant's] guilt[,]" the instruction stated that the

10

juror "must give [Defendant] the benefit of the doubt and find him not guilty." When the trial court asked if any venirepersons could not follow that instruction, six panelists raised their hands. Venirepersons 30 and 31 were not among those who raised their hands.

The trial court also instructed the panel that it was their "duty . . . to follow the law as the Court gives it to you in the instructions even though you may disagree with it." When the trial court asked if anyone "would not be willing to follow all instructions that the Court will give to the jury[,]" no response was made. The assistant prosecutor twice asked the panel if anyone could not be fair and impartial, and neither challenged juror indicated that they could not be fair and impartial.

Defense counsel then asked the venire panel, "[D]o any of you feel like you would need to hear from [Defendant] . . . if you were going to consider him to be innocent? In other words, do any of you -- would you feel like you had to hear his side of the story?" Defense counsel observed "some heads nodding[,]" and she eventually called on a total of 28 venirepersons to get their individual responses. As she did so, defense counsel reiterated her questions: "If you didn't hear -- For the people -- For you, ma'am, and for the people that I've already spoken to, if you didn't hear from [Defendant], could you acquit him or could you find him not guilty, or would you have to hear from him? Anybody -- Yes, sir. Number --[.]" Before reaching Venirepersons 30 and 31, defense counsel asked other individual venirepersons similar questions, such as, "[s]o you say you'd have to hear from him if you were going to acquit him?" and "[d]o you think you would have to hear from him in order to find him not guilty?"

11

Before reaching Venirepersons 30 and 31, the following exchange took place with Venirepersons 17 and 20[6]:

| | |
|---|---|
| [Defense counsel]: | Yes, sir. No. 20? |
| VENIREPERSON NO. 20: | No. 20. I'd have to hear from him. |
| [Defense counsel]: | You would have to hear from him. Okay. Thank you. Yes, sir. No. 17? |
| VENIREPERSON NO. 17: | Yes. I'd definitely have to hear from him on his side of the story. |
| [Defense counsel]: | Okay. So you'd have to hear it from him -- |
| VENIREPERSON NO. 17: | Yes. |
| [Defense counsel]: | -- to get his side. Okay. Anyone else on this side? Number -- |
| VENIREPERSON NO. 31: | 31. |
| [Defense counsel]: | -- 31. Sir, would you have to hear from him? |
| VENIREPERSON NO. 31: | Yes. |
| [Defense counsel]: | Okay. |
| VENIREPERSON NO. 31: | We're here to hear both sides. |
| [Defense counsel]: | Okay. You say you'd want to hear both sides. Would you need to have -- Would you need to see [Defendant] testify? |
| VENIREPERSON NO. 31: | I think we'd get both sides if we could hear from him. |
| [Defense counsel]: | Okay. Anybody else agree with Mr. -- Yes, sir? |
| VENIREPERSON NO. 30: | 30. |

---

[6] Venireperson 17 was stricken for cause based upon defense counsel's objection that this venireperson "would have to hear from [Defendant]." Venireperson 20 was stricken for cause upon the request of the State without objection by Defendant.

12

| | |
|---|---|
| [Defense counsel]: | No. 30.  Do you feel the same way? |
| VENIREPERSON NO. 30: | Yes.  The same way. |
| [Defense counsel]: | Okay.  Anyone else?  [Defense counsel went on to question other venirepersons.] |

After defense counsel finished questioning the venire, both counsel approached the bench and the following colloquy occurred:

| | |
|---|---|
| [Assistant prosecutor]: | Judge, regarding the questions about [Defendant] testifying, the question wasn't asked that you were going to give them an instruction -- that they'll get an instruction about [Defendant] testifying, not testifying.  I know that's a slippery slope for me to ask questions about, so that's the reason I wanted to approach.  I don't know if you want to say to the jury that they'll get instructions about [Defendant] testifying, what the instruction is, or I can do it, but I think it's obvious that everybody would always like to hear what [Defendant] has to say.  They want to hear both sides of the story.  And the way the questions were phrased, I think anybody would say that. |
| [Trial court]: | We're not going to reopen voir dire entirely.  It's too late.  But it should have been covered in the State's questions. |
| [Assistant prosecutor]: | Judge, I'm not allowed to ask that question?  I'm not allowed to ask about [Defendant] testifying? |
| [Trial court]: | All right.  Regardless, I'm not going to reopen that issue.  Anything else? |
| [Defense counsel]: | No, Your Honor. |
| [Trial court]: | Okay. |

(Proceedings returned to open court.)

When defense counsel began to request strikes for cause based upon a venireperson stating that he or she "would have to hear from [Defendant,]" the following exchange occurred:

13

[Assistant prosecutor]: Judge, on all of these, we're going to have an issue. I think the [trial c]ourt made a statement that I -- I should have asked them those questions; however, if I would have done that --

[Trial court]: I was mistaken. I agree.

[Assistant prosecutor]: -- it would have been an immediate mistrial or grounds for reversal for me questioning about [Defendant] testifying. Now, by asking them vague questions about, of course, everyone would want to hear from [Defendant], we would like to hear from [Defendant]. The problem was by not getting a chance to go back to ask specific questions and ask the question about you're going to have an instruction, then we have these vague answers, well, yeah, I'd like to hear from him, I'd like to hear both sides of the story. And now we're going to have an issue going through probably 20 or 25 of these people.

[Defense counsel]: Your Honor, if I could respond?

[Trial court]: You may.

[Defense counsel]: I asked this question on the heels of the question stating the law about how [Defendant] does not have to put on any evidence for this case. I stated the law about that, and then I went on to ask about whether or not they would have to hear from [Defendant]. There were some people that did say they would like to or would prefer to, and there were some people that said that they would have to hear from him in order to consider a verdict of not guilty.

[Trial court]: What I would prefer to do in the future in these trials is, if there is an objection, just approach the bench about the vagueness and take it up during that voir dire rather than the end and then go back to the State and come back to the defense again, never ending repetition. So I'll accept some responsibility for this, but we will just have to do it one at a time. [The trial court went on to take up defense counsel's first objection, to Venirepersons 16 and 17.]

Defense counsel made objections to various panelists and then addressed Venirepersons 30 and 31:

[Defense counsel]: Okay.  30 and 31 both said that they would have to hear from [Defendant].

[Assistant Prosecutor]: 30 and 31?  Judge, I wrote down that 31 said I'm here to hear both sides, get both sides, if we hear from [Defendant].  And then 30 said I'm the same as 31.  So I don't think they said that they have to hear from [Defendant].

[Trial court]: And the response by defense on that?  What do you recall?

[Defense counsel]: I think that [the assistant prosecutor] is right.  They did say that they would have to hear both sides, but our notes say that he would -- they would need to hear from [Defendant] for -- to get his side.

[Assistant prosecutor]: He said he'd get both sides if they hear from [Defendant], is what I wrote down.

[Second assistant prosecutor]: And that does bring up another issue, Judge.

[Trial court]: Sum totality of the circumstances, I'll overrule the objection on 30 and 31.

The State agrees that "Venirepersons 30 and 31 were selected to serve on the jury."[7]

Defendant did not testify or call witnesses on his behalf.  The jury instructions included Instruction No. 5: "Under the law, a defendant has the right not to testify.  No presumption

---

[7] The transcript does not associate the venireperson numbers with the names of the jurors who were finally selected to decide the case and a list of the venirepersons is not included in the legal file.  During voir dire, Venirepersons 30 and 31 were referred to by number and not by name.  The announcement of jurors was by name, only.  Defendant's motion for new trial alleged that the trial court erred in overruling his motion to strike two named jurors, but it did not identify the jurors by their venire numbers.  At argument on the motion for new trial, defense counsel referred to two jurors by their names and stated that one of the jurors was "Juror No. 30[.]"  Defendant's brief refers to "Venireman" Nos. 30 and 31 along with two jurors' names in his point relied on, and the names are the same names referenced in the motion for new trial.  Based upon the State's agreement that Venirepersons 30 and 31 were selected for the jury, we will assume that they were in fact selected for the jury and that they are the same persons identified by name in Defendant's motion for new trial.

15

of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify."

Defendant argues that "the trial court clearly abused its discretion in failing to strike [Venirepersons 30 and 31] for cause" and relies on *State v. Stanley*, 124 S.W.3d 70, 77 (Mo. App. S.D. 2004), for the principle that "[w]here a venireperson's answer suggests a possibility of bias, that person is not qualified to serve as a juror unless, upon further questioning, he or she is rehabilitated by giving unequivocal assurances of impartiality." The State argues in response that the jurors in question "did not state, as Defendant now argues, that they would need to hear Defendant testify in order to acquit Defendant." The State maintains that defense counsel's "last question to Venireperson 17 was whether she would have to hear from Defendant to get his side of the story." According to the State, "Venireperson 31 affirmed that this is what he was looking for when he said, 'I think we'd get both sides if we could hear from him.'" The State insists that this was not an indication that Venirepersons 30 and 31 would have to hear from Defendant before they could acquit him but instead that they would have to hear from Defendant to hear his side of the story.

The State's suggested interpretation of the situation ignores that defense counsel was following up with individual jurors who had already given a positive response to her questions: "[D]o any of you feel like you would need to hear from [Defendant] . . . if you were going to consider him to be innocent?  In other words, do any of you -- would you feel like you had to hear his side of the story?" Venireperson 17's statement was, "Yes.  I'd definitely have to hear from him on his side of the story." The focus of the statement was not about hearing evidence helpful to the defense; it was about hearing Defendant's "side of the story" directly from him.  Defense counsel reiterated this interpretation by replying,

16

"Okay. So you'd have to hear it from him . . . . to get his side. Okay." Regardless of whether Venireperson 17 was emphasizing that it was necessary to hear Defendant's side of the story directly from his own mouth, the venireperson was still expressing a need to hear the Defendant testify. This made questionable Venireperson 17's impartiality, and Defendant's request that that panelist be stricken was appropriately granted.

Defendant correctly argues that the venire was asked "whether any of them felt like they would need to hear from [Defendant] before they could consider him to be innocent." When defense counsel reached Venireperson 31 and asked, "Sir, would you have to hear from him?" the reasonable interpretation of a positive response to that question was not that Defendant would have to testify in order for the jury to know his side of the story but that the potential juror would have to hear from Defendant in order to acquit him.[8]

The State disputes Defendant's claim that his case "cannot be distinguished from" three previous cases that were reversed for juror bias: *State v. Holland*, 719 S.W.2d 453, 454-55 (Mo. banc 1986), *Stewart*, 692 S.W.2d at 299, and *State v. Bishop*, 942 S.W.2d 945, 948-49 (Mo. App. S.D. 1997).

In *Holland*, defense counsel asked, "If my client didn't take the stand, would you wonder why he didn't?" 719 S.W.2d at 454. The venireperson replied, "Yes, because I would like to hear his side of the story--what happened." *Id.* The venireperson agreed that the defendant was presumed innocent as he sat there "right now[,]" and confirmed that he understood that the defendant did not "have to get up there and tell his side of the--give his side of the story[.]" *Id.* But when defense counsel asked, "[e]ven if the judge instructed you not to think that way, would you still have a hard time with it?" the venireperson replied,

---

[8] And even if the response were interpreted as suggested by the State, it would still be related to the requirement that Defendant testify.

17

"Because I wouldn't really know about the facts if he didn't get up there and tell about it." *Id.* The defendant did not testify. *Id.* at 454 n.1. The Court reasoned, "[i]n short, neither the prosecutor nor the court made any attempt to rehabilitate [the venireperson] or seek further information to clarify or explain his answers." *Id.* at 455. The Court reversed the conviction based upon "[t]he failure of the trial court to sustain [the] defendant's challenge for cause of [a] venireman[.]" *Id.*

In *Stewart*, when asked if she would expect the defendant to testify, the venireperson stated, "I would think so." 692 S.W.2d at 296. In further questioning, the defense counsel elicited that the venireperson "would just like to hear his side of the story[,]" and she would "like eye contact with the people [she is] expected to be judging[.]" *Id.* She also stated that she "could not honestly say" what she would think if Defendant did not testify and she might "[p]ossibly" think he was trying to hide something. *Id.* When asked if she would "have some real problems if the defendant didn't testify[,]" she replied, "I think so." *Id.* And she agreed that she "would [be] more apt to think he was guilty if he didn't testify[.]" *Id.*

The prosecutor in *Stewart* inquired about the venireperson's understanding that the defendant did not have to testify, and the venireperson replied, "Yes, sir, but I would like to hear him say something in his own defense." *Id.* The venireperson did agree, however, that she thought she could "still be fair and an impartial juror and just judge the State's case" if the defendant did not testify. *Id.* She reiterated that she "would like it" if he testified. *Id.* at 297.

Defense counsel in *Stewart* revisited the issue with the venireperson. The venireperson agreed that she would prefer Defendant to testify and that "[i]f [she] were in the chair [herself], [she] would like to be able to speak in [her] defense[.]" *Id.* When asked

18

if she would "hold it against him if he doesn't testify[,]" the venireperson replied, "It depends. He has to have the opportunity to do so, and if it were I [sic] and things looked against me, I would choose to do so. You get what I mean?" *Id.* at 298. The Court found that the venireperson "never unequivocally stated that she would not draw any inference of guilt from [the] defendant's failure to testify. *Id.* at 299. It concluded instead that

> [d]espite the opposing tugs and pulls from respective counsel in their questioning, [the venireperson] never abandoned her belief that an innocent man would testify in his own behalf. We are left with the definite impression that a defendant's failure to testify would, per se, be an indication to her that he was guilty of the offense charged and a factor which she would consider in arriving at a verdict.

*Id.*

The State argues that all of the cited cases included more than just an indication that the venireperson "wanted to hear from the defendant[.]" Certainly, in *Holland* and *Stewart*, more information was elicited from the venirepersons than was gathered from the two jurors in this case. But in *Bishop*, we reversed the conviction after finding that "the trial court erred when it rejected [the defendant's] challenge for cause to [a] venireperson . . . who later served as a juror." 942 S.W.2d at 946. Very little information was given by the venireperson in question, but we found it sufficient to demonstrate her bias. The voir dire question at issue in *Bishop* (the last portion of which was not a model of clarity) was:

> And is there anyone here who believes that just because a person does not testify, that you would be more likely to vote guilty? ... [i]s there anyone here who thinks that if a person does not testify, that they're hiding something? I take it from your silence that everybody agrees that if a person does not, and if [Defendant] does not testify here today? Yes, sir?

*Id.* at 948. One venireperson stated, "I have a problem with that[,]" and defense counsel asked, "Is there anyone else who has a problem with drawing no inference at all from a person not testifying?" *Id.* A second venireperson replied in the affirmative. *Id.* Defense

19

counsel asked if there was "anyone else" and the venireperson in question replied by stating her first and last name. *Id.* The venireperson was not questioned again regarding "her concerns about an accused who does not testify." *Id.* We found that this venireperson's "response clearly indicated her possible bias against an accused who did not testify." *Id.* at 950.

We rejected the State's argument in *Bishop* that the venireperson "never elaborated on why she stated her name in response to defense counsel's question" as being irrelevant. *Id.* We also rejected the argument that the venireperson did not give any other indication that she could not follow the trial court's instructions because "[i]t was only *after* defense counsel's later explanation of that principle [regarding the failure to testify] that [the venireperson] indicated that she had a problem with not drawing an inference of guilt from failure to testify." *Id.* (emphasis added.)

We do not find the State's attempts to distinguish *Holland*, *Stewart* and *Bishop* persuasive, especially since the trial court explicitly precluded any attempt to rehabilitate Venirepersons 30 and 31. *Cf. Holland*, 719 S.W.2d at 455 ("neither the prosecutor nor the court made any attempt to rehabilitate [the venireperson] or seek further information to clarify or explain his answers"); *Bishop* at 942 S.W.2d at 950 ("neither the prosecutor nor the trial judge tried to question [the venireperson] on this subject"). In the absence of any additional clarification, as it stood after defense counsel's inquiry, both Venirepersons 30 and 31 "need[ed]" to have Defendant testify. "Need" is the language of requirement; it does not suggest mere curiosity or preference.

The State next notes other instructions given to the jury, and it urges that the "nonverbal responses" of Venirepersons 30 and 31 indicated that they "could be fair and

20

impartial."  The court's instructions to the panel regarding the presumption of innocence, the State's burden of proof, and the duty of the jurors to follow the law were given *before* defense counsel asked if anyone "would need to hear from" Defendant in order "to consider him to be innocent[.]"  The same is true for the State's general inquiry about whether anyone could not be fair and impartial; that also *preceded* any questioning about whether any potential jurors would need to hear from Defendant.  *Cf. **Bishop***, 942 S.W.2d at 950 (the venireperson's bias was disclosed only after defense counsel's specific questioning).

The State also notes that the jury was instructed before closing arguments that "[u]nder the law, a defendant has the right not to testify.  No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify."  Such an instruction was certainly appropriate, but it was not the equivalent of "unequivocal assurances of impartiality" from Venirepersons 30 and 31 that would demonstrate their ability to follow that instruction despite any biases they might have against a Defendant who chose not to testify.  *See **Stanley***, 124 S.W.3d at 77.

The last positions expressed by Venirepersons 30 and 31 were that they would "need" to hear from Defendant and that they would "get both sides if [they] could hear from him."  Those un-rehabilitated responses rendered them unqualified to serve as jurors, and the trial court therefore erred in refusing Defendant's request that they be stricken for cause. The error was prejudicial because Defendant did not testify, and these two venirepersons -- who "need[ed]" that to happen -- served on the jury that convicted him.  As a result, we must grant Defendant's second point and remand the case for a new trial on the misdemeanor offense of sexual misconduct in the second degree.  *See **State v. Favell***, 536 S.W.2d 47, 51 (Mo. App. St.L.D. 1976) (appellant's conviction of a less serious charge "constituted an

21

acquittal of the more serious degrees of" the offenses charged and upon retrial "the jury may be instructed only on" the less serious charge).


DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS