

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD82413 |
| | ) | |
| THOMAS J. SAVAGE, III, | ) | FILED: September 29, 2020 |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County**
**The Honorable Janet L. Sutton, Judge**

**Before Division Four: Cynthia L. Martin, C.J., P.J., and**
**Alok Ahuja and Edward R. Ardini, JJ.**

Following a jury trial, Thomas Savage was convicted in the Circuit Court of Clay County of second-degree burglary and misdemeanor stealing. Savage appeals. He asserts nine Points, which argue that the circuit court erred: in denying his motion to strike a venireperson for cause; in overruling his objection to what he characterizes as victim-impact testimony; in ordering restitution; and in taxing certain costs against him. Savage has also filed a motion to remand the case to the circuit court for a new trial, or for the circuit court to consider an untimely new trial motion, based on his belated discovery of impeachment evidence which the State failed to timely disclose. The State has filed a motion to dismiss based on the "escape rule." We deny the State's motion to dismiss and Savage's motion to remand, and otherwise affirm the judgment of the circuit court.

## Factual Background

On May 24, 2018, Savage was charged with second-degree burglary in violation of § 569.170,[1] and the class D felony of stealing property valued at more than $750 in violation of § 570.030.

Savage's prosecution arose from the burglary of a private residence in Kansas City on April 24, 2017. The home belonged to a senior officer with the Kansas City Police Department. At trial, the victim testified that, when he returned home from work around 6:00 p.m. on April 24, he noticed that the garage door was open. As he entered the home through the garage, the victim noticed that the road film on a vehicle that was parked in the garage had been disturbed. A door leading to the back porch was damaged, and the victim noticed that several drawers, closets, and rooms throughout the house had been disturbed. A 55-inch television, various items of jewelry, and a Bose stereo were missing.

During their investigation, police recovered a latent palm print from the driver's door of the car that was parked in the victim's garage. At trial, Julie Snyder, an examiner with the Kansas City Police Crime Laboratory, testified that the print belonged to Savage. Investigators also recovered other prints from the scene, five of which Snyder testified were "prints of value." Savage was excluded as the source of the other prints.

A neighbor told police that he had noticed a vehicle he did not recognize parked in front of the victim's property at approximately 11:00 a.m. on April 24. At trial, the neighbor testified that he did not see anyone in or around the vehicle. The neighbor testified that the vehicle was a "lighter shade of blue," was "likely" a two-door but possibly a four-door sedan, and that it was also potentially "something foreign." The vehicle had a temporary rear license tag. The neighbor testified that

---

[1] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri.

he saw a "[d]ecorative" sticker in the center of the back window, similar to an "In loving memory" sticker, although he did not read the sticker and did not know what it said.

A couple of weeks after the burglary, police conducted a traffic stop on a blue Ford Focus with a temporary tag driven by Savage. Police observed Savage driving the same blue Ford Focus with temporary tags on a later occasion, and an acquaintance also testified that Savage drove the vehicle. The vehicle had a "light colored" sticker in the rear windshield, apparently identifying the dealership from which it had been purchased.[2]

Savage gave officers his phone number during the traffic stop. An analysis by a Kansas City Police Department detective indicated that Savage's phone had made calls using a cell phone tower within the coverage area of the victim's home between 10:16 and 11:11 a.m. on April 24, 2017. The phone number had been activated on April 17, 2017; the account belonged to Savage's mother.

During questioning by police, Savage denied having been in the "Northland" (*i.e.*, the part of Kansas City north of the Missouri River), where the victim's home is located. Savage claimed that he never went further north than his workplace, which was located in Kansas City, Kansas, on the south side of the Missouri River.

The jury returned its verdict finding Savage guilty of second-degree burglary and misdemeanor stealing (as a lesser-included offense of the charged stealing offense). The circuit court sentenced Savage to six years' imprisonment in the Department of Corrections for burglary, and 180 days' imprisonment in the county jail for stealing, with the sentences to be served concurrently. In addition, the court ordered Savage to pay restitution of $4,711.54, ordered court costs to be taxed against him, and entered a $46 judgment in favor of the Crime Victims'

---

[2] Several photographs of Savage's vehicle were admitted in evidence. These photographs were not included in the record on appeal.

Compensation Fund. At sentencing, Savage objected to the restitution award, and to the taxing of costs given his indigent status.

Savage filed his direct appeal on December 31, 2018.

While his appeal was pending, Savage filed a motion to retax costs in the circuit court on March 4, 2019. After holding a hearing, the circuit court denied Savage's motion to retax costs on March 20, 2019. On March 22, 2019, Savage filed a separate appeal to this Court from the circuit court's denial of his motion to retax costs. No. WD8663. In the costs appeal, Savage argued that the circuit court should have assessed court costs against the State, and that Savage should not have been taxed any costs because he was indigent. We rejected Savage's attempt to challenge the "inter-party allocation" of court costs in an appeal from the denial of a motion to retax costs; we held that "a circuit court's determination as to which party should be taxed costs is part of the judgment" to be challenged on direct appeal. *State v. Savage*, 592 S.W.3d 42, 45 (Mo. App. W.D. 2019). We held that a motion to retax costs was intended to challenge "any subsequent determination as to the amount and types of costs to be assessed," not the court's initial decision identifying the party responsible for payment of costs. *Id.* at 47. Accordingly, we affirmed the circuit court's judgment denying Savage's motion to retax costs "because [Savage's motion to retax costs] was an improper effort to revisit the allocation directly adjudicated by the final judgment of conviction." *Id.*

While Savage's appeal was pending, his trial counsel received discovery materials in another case, which included material which Savage contends should have been produced in discovery in <u>his</u> case. The newly discovered materials documented a prior occasion in 2014 in which the fingerprint examiner, Julia Snyder, had misidentified a latent fingerprint. Snyder testified at trial that the palm print recovered from a car in the garage of the victim's home belonged to Savage. Savage contends that the report concerning Snyder's 2014

4

misidentification of a fingerprint would have permitted him to impeach her testimony. He filed a motion in this Court to remand the case to the circuit court for a new trial based on the newly discovered evidence, or instead to remand to the circuit court to permit it to consider a belated new-trial motion.

Finally, four days before oral argument, the State filed a motion to dismiss Savage's appeal on the basis of the "escape rule," because Savage had failed to maintain contact with his parole officer.

## Discussion

On direct appeal, Savage asserts nine claims of trial court error. In Point I, Savage argues that the circuit court abused its discretion in denying a defense motion to strike a venireperson for cause. In Point II, he argues that the circuit court abused its discretion in overruling his objection to testimony by the victim, during the guilt phase of the trial, concerning the effect the burglary had on the victim. In Points III and IV, Savage argues the court erred in ordering him to pay restitution. In Points V through IX, argues that the circuit court erred in taxing costs against him, and in refusing to retax costs.

In addition to the nine Points raised in his appellate briefing, Savage has also filed a motion to remand the case to the circuit court for a new trial based on newly discovered evidence.

## I.

We begin by addressing the State's motion to dismiss the appeal based on the "escape rule."

"'The judicially-created escape rule operates to deny the right of appeal to a defendant who escapes justice. Whether or not to use the escape rule to dismiss an appellant's claims of error rests within the sound discretion of the appellate court.'" *State v. Byington*, 575 S.W.3d 720, 723 n.1 (Mo. App. E.D. 2019) (quoting *Townsend v. State*, 495 S.W.3d 225, 228 (Mo. App. E.D. 2016)). "We never condone absconding

from justice, but even when it would be within our discretion to invoke the escape rule, we often prefer to address the merits of the appeal." *Id.* (citations omitted).

The State's motion to dismiss is based on the fact that Savage has apparently failed to maintain contact with his parole officer since mid-June 2020. According to a report from Savage's parole officer attached to the State's motion to dismiss, "Savage reported as directed and maintained contact with [his parole] Officer via virtual methods as mandated by COVID-19 Pandemic guidelines on 03/10/2020, 03/24/2020, 04/07/2020, 04/23/2020, 04/30/2020, 05/07/2020, 05/19/2020, 06/01/2020 and 06/10/2020." The parole officer's report indicates that the officer spoke with Savage's mother on July 1, 2020, and that she indicated that Savage's cell phone service had been suspended due to his non-payment of his phone bill. The parole officer's report, dated July 14, 2020, recommends "Delayed Action" in Savage's case. The report states that "[r]eengagement efforts will continue for the next 90 days and when Savage is arrested or reengaged, a supplemental report with a recommendation will be submitted to the Parole Board."

We decline to apply the escape rule in this case. Savage's parole officer has not recommended immediate action based on Savage's failure to maintain contact, and we presume that Savage will face appropriate consequences for his lack of contact in connection with his parole. We note that Savage maintained proper contact with his parole officer for several months, and that his current failure to communicate is occurring during the unusual circumstances of the COVID-19 pandemic. Finally, because we are prepared to affirm Savage's conviction, no further proceedings will be required in which the State or the judicial system would be prejudiced by Savage's unavailability.

The State's motion to dismiss is denied.

## II.

We next address Savage's motion to remand.

On July 7, 2020, while his direct appeal was pending in this Court, Savage filed a motion for remand to the circuit court for a new trial, or to permit the circuit court to consider a motion for new trial, based on what Savage alleges is newly discovered evidence. We deny the motion to remand.

**A.**

On April 23, 2020, while Savage's appeal was pending, his appellate counsel received an e-mail from trial counsel. Trial counsel forwarded to appellate counsel discovery material which trial counsel had received in a different case. The discovery material concerned the Kansas City Police Department fingerprint examiner, Julia Snyder, who testified in Savage's case. Snyder testified in Savage's trial that a latent palm print recovered from the side of a vehicle in the victim's garage belonged to Savage. This was the only physical evidence directly tying Savage to the victim's home.

The discovery material at issue was produced to the prosecution, and then to Savage's trial counsel, by the Kansas City Police Department in the other case, in response to a discovery request which was essentially identical to a discovery request propounded in Savage's case. Savage therefore contends that the discovery material should have been produced in _his_ case. In its response to the motion to remand, the State does not dispute that the information should have been produced to Savage during pretrial discovery, or that Savage's counsel only discovered the information during the pendency of this appeal.

The material produced to trial counsel in the other case consists of two items. One is a footwear identification proficiency test administered in 2019, in which Snyder failed to accurately identify a shoeprint. This proficiency test occurred after Savage's trial, and the results of that test could not have been produced to Savage in this case.

7

The other item, which is the focus of Savage's remand motion, is a "Nonconforming Testing Report Form" prepared by Snyder's supervisor in the Kansas City Police Crime Laboratory in June 2014. The Report details an incident in April 2014 in which Snyder identified a latent print as belonging to a particular individual, by comparing the latent print to known examples of the suspect's fingerprints contained in an automated fingerprint identification system ("AFIS") computer database. Snyder's supervisor verified her identification of the suspect's fingerprint. After the supervisor's verification, police were notified of the suspect's identification.

One of the known prints in the AFIS database was a low-resolution image, while the other lacked detail of part of the fingerprint. Moreover, Snyder was unable to download the known prints from the AFIS database, and therefore they were compared to the latent print only on the screen of the AFIS workstation.

Several days later, Snyder was entering information concerning the fingerprint comparison into the AFIS database, when "she noticed differences between the latent and [the suspect's] known print." Snyder raised her concerns with her supervisor. Her supervisor again reviewed the relevant fingerprints on the AFIS screen. From that review, "some inconsistencies between the two prints were observed that caused concern, but not sufficient to determine that the identification was in error." Due to their concerns over the accuracy of the earlier identification, Snyder's supervisor requested that police obtain new, known fingerprint samples from the suspect. Based on those new "elimination prints," Snyder and her supervisor determined that their initial identification of the suspect was in error, and they notified police.

The Nonconforming Testing Report Form identifies several factors which contributed to the initial misidentification: (1) that the latent print actually consisted of two separate overlapping prints which appeared to be a single

8

fingerprint; (2) the poor quality of the known prints in the AFIS database; (3) the fact that the known fingerprints could only be reviewed on the screen of the AFIS workstation, and not downloaded for more careful examination; (4) fatigue of Snyder and her supervisor, who were both working extended shifts at the time; and (5) a "[f]eeling of urgency to make the identifications," because of concern that violent perpetrators were at large, and could cause further serious injuries if not apprehended quickly.

The report recommends that the laboratory develop policies for when fingerprint comparisons will be made using the AFIS workstation screen, and to limit the performance of definitive fingerprint comparisons when examiners may be fatigued or working extended shifts. The report concludes with this observation:

> Ms. Snyder and [her] Supervisor . . . are both competent latent print examiners and both have provided excellent print examinations in the past. This error was the result of a number of factors, but not the ability of either [of the] two examiners. The error was found by Ms. Snyder and confirmed by [her] Supervisor . . . when they both were rested. For these reasons, neither were removed from casework.

**B.**

Savage's motion to remand is not specifically authorized by Missouri's rules of criminal procedure.

> [Savage]'s motion is not within the time limits for filing a motion for a new trial pursuant to Rule 29.11(b) because that limit is 25 days after the verdict. Once the time for filing a motion for a new trial has passed, the Missouri rules have no provision for the granting of a new trial based on newly discovered evidence even if the evidence is available prior to sentencing. Additionally, new evidence that is not in the record should not be considered on appeal. Generally, this Court will not remand a case before an appeal is concluded if the lone fact of newly discovered evidence is not enough to grant a new trial. But an appellate court has the inherent power to prevent a miscarriage of justice or manifest injustice by remanding a case to the trial court for consideration of newly discovered evidence presented for the first time on appeal. An appellate court will exercise this power in its discretion.

*State v. Terry*, 304 S.W.3d 105, 108-09 (Mo. 2010) (citations and footnotes omitted).

9

These standards apply here, even though Savage claims not merely that he has discovered new evidence, but that the State violated its constitutional obligations to produce exculpatory or impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Like this case, *State v. Vickers*, 560 S.W.3d 3 (Mo. App. W.D. 2018), also involved a belated request for a new trial based on the discovery of an alleged *Brady* violation. We explained:

> Rule 29.11(b) does not make an exception extending the time to file a motion, even where the newly discovered evidence on which the motion for a new trial is predicated is not discovered until after the filing deadline has passed. Because no exception is provided, a request to add a ground to the motion for new trial is a nullity when it is made after the extension period has expired. In other words, a motion for new trial may not be filed or amended to allege, as a basis for a new trial, the existence of newly discovered evidence which was not discoverable until after the filing deadline had passed. Accordingly, an untimely motion for new trial is not an appropriate means to introduce new evidence, preserves nothing for appeal, and is a procedural nullity. Nevertheless, an appellate court may review the untimely claim to determine whether extraordinary circumstances exist that justify remand and establish that manifest injustice or miscarriage of justice occurred.
>
> Generally, alleged *Brady* violations arising after the time in which a motion for new trial must be filed are more appropriately addressed in the context of a habeas corpus motion in which the prosecution's serious alleged violation of *Brady* can be explored. Nevertheless, Missouri's appellate courts have considered *Brady* claims raised through other avenues but only when the appellate court had a proper record to consider or where the facts were uncontroverted.

*Id.* at 23-24 (citations and internal quotation marks omitted).

We do not believe this case involves extraordinary circumstances in which a remand to the circuit court is necessary to avoid a manifest injustice or miscarriage of justice, and we therefore decline to exercise our discretion to remand this case to the circuit court for consideration of granting a new trial. We recognize that the 2014 Nonconforming Testing Report Form could potentially be used to impeach

10

Snyder's credibility, and that Snyder's identification of Savage's palm print at the scene of the burglary was important evidence establishing his guilt. But even if the 2014 report is appropriate impeachment material, it may be of limited value, for multiple reasons. The mistaken identification occurred three years before Snyder's identification of Savage's palm print. Although the mistaken identification documented in the 2014 report was made by Snyder, it was verified by her supervisor. Snyder herself developed concerns over the accuracy of the identification, and promptly brought the matter to the attention of her supervisor for follow up. The 2014 report suggests that multiple circumstances contributed to the mistaken identification – including a confusing, composite latent print; poor quality or incomplete comparison prints which could only be viewed on the AFIS workstation's screen; fatigued examiners at the end of an extended work shift; and a sense of urgency because violent criminals were at large. Savage does not argue that any of those circumstances exist in the present case. Moreover, the 2014 report makes no suggestion that Snyder committed misconduct, acted untruthfully, or exhibited incompetence. To the contrary, the report emphasizes that Snyder herself discovered and reported the potential misidentification, and that the causes of the misidentification did not implicate Snyder's abilities as a fingerprint examiner.

In other cases involving untimely requests for a new trial, this Court has found that impeachment evidence which was significantly weightier did not justify a remand. For example, in *State v. Nylon*, 311 S.W.3d 869 (Mo. App. E.D. 2010), the Court denied a motion to remand where the defendant presented evidence that two of the City of St. Louis Police Department officers who testified at his trial had serious credibility problems. The evidence indicated that prosecutors had "declined to prosecute numerous cases involving [one of the officers'] testimony because his testimony was no longer reliable and that he had been accused of lying on search warrant applications," including by listing "either a dead person or a person in jail

11

as one of his confidential informants." *Id.* at 875. The evidence also indicated that prosecutors "had lost confidence in [the other officer] as a witness" based on false statements in a warrant application, and had dismissed one prosecution "and [were] in the process of reviewing other cases involving" the officer. *Id.*

In *Nylon*, the Eastern District recognized that "[e]vidence that the officers' credibility has been eviscerated to the extent that the St. Louis Circuit Attorney's Office dismissed cases involving their testimony could have a dramatic effect on the jury's weighing of the testimony in this case." *Id.* at 878. It nevertheless held that the extraordinary remedy of a remand was unwarranted because the new evidence "has [no] relation to the facts of this case," and "[t]here is no evidence that the officers fabricated their testimony in this case." *Id.* The Court distinguished two cases in which remands had been ordered based on the belated discovery of impeachment evidence, because in one of those cases, the new evidence was "the taped recantation of the alleged victim's testimony," while in the other case, "the newly discovered evidence consisted of forensic evidence that, if verified, would conclusively show that the alleged victim had perjured herself." *Id.* (discussing *Terry*, 304 S.W.3d 105, and *State v. Mooney*, 670 S.W.3d 510 (Mo. App. E.D. 1984)).

Similarly, in *State v. Daniel*, 573 S.W.3d 162 (Mo. App. S.D. 2019), the Court refused to remand a case where a principal prosecution witness was found not to be credible by a special master in an unrelated habeas proceeding, on the basis that "[t]here is no allegation that [the witness] testified falsely or otherwise engaged in wrongful conduct in this case." *Id.* at 166 n.2; *see also State v. Williams*, 504 S.W.3d 194, 198 (Mo. App. W.D. 2016) (refusing to order a remand where new evidence merely cast doubt on the credibility of a principal prosecution witness; noting that the new evidence was not a documented recantation by the witness, or physical evidence inconsistent with the defendant's guilt); *State v. Hannon*, 398 S.W.3d 108, 114-15 (Mo. App. E.D. 2013) (refusing to order a remand where newly discovered

school attendance records cast doubt on sexual-assault victim's testimony as to timing of the assault, "but they do not demonstrate that [the victim] falsely testified about Defendant committing the offenses against him").

In this case, the 2014 report does not suggest that Snyder committed any misconduct in connection with this case, or that any aspect of her testimony at Savage's trial was untrue. In these circumstances, we decline to exercise our discretion to order a remand to the circuit court. Savage's claims concerning the 2014 report are more appropriately addressed in a timely filed post-conviction proceeding, where a full record can be developed, and factual findings made. We recognize that in such a proceeding a more lenient standard of prejudice would be applied than the manifest injustice/miscarriage of justice standard we apply to Savage's motion to remand.[3] Nothing in our decision today should be read to address whether, in a future proceeding, Savage can establish grounds for a new trial based on a *Brady* violation.

### III.

In his first Point, Savage argues the trial court erred in denying his motion to strike for cause a venire member, Juror #5, after Juror #5 indicated during voir dire that they would "expect" Savage to testify.

During voir dire, the following exchange occurred between defense counsel and Juror #5:

> [Defense counsel]: A moment ago when I talked about
> [Savage]'s right not to testify and I asked if anybody would expect to
> hear from Thomas, there were a number of people that raised their
> hands. Could I see those hands again?
>
> And we'll just start, I guess, over here at Number 5.
>
> . . . .

---

[3] *See Vickers*, 560 S.W.3d at 24-25 n.13; *Buchli v. State*, 242 S.W.3d 449, 454 (Mo. App. W.D. 2007); *State v. Parker*, 198 S.W.3d 178, 180 (Mo. App. W.D. 2006).

[Defense counsel]:  And you stated that you would expect to hear [Savage]'s side of the story from [Savage]?

[Juror #5]:  I would hope to.

[Defense counsel]:  You would hope to.  Even if the Court instructs you that he has a right not to testify and that you can't hold that against him?

[Juror #5]:  Yeah.  I wouldn't hold it against him.  I just would hope to hear from him.

[Defense counsel]:  Do you have to hear from [Savage]?

[Juror #5]:  (Shaking head.)  No.

[Defense counsel]:  So you'd be able to listen to the case fairly and impartially and just judge the State's evidence and not hold it against [Savage] because he did not take the stand?

[Juror #5]:  I don't think I would.  I just – I just feel in fairness, it would be nice to hear from him.

[Defense counsel]:  And that's fine.  Would you expect – do you expect him to take the stand?

[Juror #5]:  Yes, I guess.

[Defense counsel]:  And that's fine.

[Juror #5]:  I hadn't thought about it before.

At the conclusion of voir dire, defense counsel moved to strike Juror #5 for cause.  The court denied the motion, explaining that while Juror #5 may have indicated a desire to hear from Savage, they had "also said [they] would not hold it against him [if he did not testify], and that's the guideline."  Juror #5 ultimately served on the jury which convicted Savage.

> A trial court has wide discretion in determining the qualifications of members of the venire, and on appeal the court will not disturb the trial court's ruling on a challenge for cause absent a clear abuse of discretion and a real probability of injury to the complaining party. . . .  Because the trial court is in a better position to determine a venireman's ability to impartially follow the law, doubts as to the trial court's findings will be resolved in its favor.

*State v. Walton*, 796 S.W.2d 374, 377-78 (Mo. 1990) (citations omitted).

14

"[D]enial by a trial court of a legitimate request by an accused to excuse for cause a partial or prejudiced venireperson constitutes reversible error." *James v. State*, 222 S.W.3d 302, 306 (Mo. App. W.D. 2007) (quoting *State v. Stewart*, 692 S.W.2d 295, 298 (Mo. 1985)). "A legitimate challenge is made where it clearly appears from the evidence that the venireperson is prejudiced and, as a result, cannot be fair and impartial." *State v. Wilson*, 998 S.W.2d 202, 205 (Mo. App. W.D. 1999); *accord State v. Kalter*, 442 S.W.3d 124, 131 (Mo. App. S.D. 2014) ("Trial judges should sustain challenges to jurors whose responses make questionable their impartiality." (quoting *Stewart*, 692 S.W.2d at 299)). Whether a prospective juror is prejudiced and cannot be fair and impartial "must be determined on the basis of the entire examination and not just a single response." *State v. Grondman*, 190 S.W.3d 496, 498 (Mo. App. W.D. 2006). And, "[w]hen the examination leaves uncertainty about the venireperson's ability to be fair and impartial, the trial court has a duty to make an independent inquiry regarding fitness for jury service." *Id.*

"The critical question on a challenge for cause is whether the venireperson unequivocally indicated an ability to evaluate the evidence fairly and impartially." *Id.* "Where a venireperson's answer suggests a possibility of bias, that person is not qualified to serve as a juror unless, upon further questioning, he or she is rehabilitated by giving unequivocal assurances of impartiality." *James*, 222 S.W.3d at 306 (quoting *State v. Stanley*, 124 S.W.3d 70, 77 (Mo. App. S.D. 2004)); *accord Walton*, 796 S.W.2d at 377; *Grondman*, 190 S.W.3d at 498.

"A venireperson who expresses a bias against a defendant for exercising his Fifth Amendment right not to testify is not considered fair and impartial, making him subject to being struck for cause," *Edgar v. Dormire*, No. 04-0320CVWDWP, 2005 WL 2406159, at *3 (W.D. Mo. Sept. 29, 2005) (citing *State v. Bishop*, 942 S.W.2d 945, 949-50 (Mo. App. S.D. 1997)), unless the potential juror is thereafter rehabilitated. *See White v. State*, 290 S.W.3d 162, 166 (Mo. App. E.D. 2009)

15

(rehabilitation of a prospective juror must be "responsive to the indication of partiality" and provide a "clear, unequivocal assurance that the juror would not be partial" (quoting *State v. Edwards*, 740 S.W.2d 237, 243 (Mo. App. E.D. 1987))).

In this case, Juror #5 indicated during voir dire that they "would hope to hear from" Savage, that "it would be nice to hear from him," and that they would "expect him to take the stand."[4]  Juror #5 also stated, however, that they did not "have to hear from" Savage, and stated – twice – that they would not hold it against Savage if he did not testify.  Moreover, by their manner of responding to defense counsel's question, Juror #5 also agreed that they would "be able to listen to the case fairly and impartially and just judge the State's evidence."

While Juror #5 clearly indicated that it would be their *preference* that Savage testified, they just as clearly indicated that this was not *a requirement*.  Nor did Juror #5 indicate at any point that they would draw an adverse inference from Savage's failure to testify, that they believed Savage had an obligation to present his side of the story, or that Juror #5 believed an innocent person would testify if prosecuted.

Juror #5 was adequately rehabilitated, despite their expression of a preference to hear from Savage.  In *State v. Wade*, 467 S.W.3d 850 (Mo. App. W.D. 2015), during voir dire a venireperson expressed a desire to hear testimony from the defendant at trial; he stated that even with the court's instruction against drawing an adverse inference from the defendant not testifying, "deep inside, [he] would be

---

[4]  We recognize that one meaning of the word "expect" has a normative connotation:  "to consider reasonable, due, or necessary," or "to consider bound in duty or obligated."  *See Expect*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/expect (visited Sept. 8, 2020).  But an equally common meaning of the term is simply predictive:  "to consider probable or certain," or "to anticipate or look forward to the coming or occurrence of" an event.  *Id.*  Given the remainder of Juror #5's voir dire testimony, in which they stated a "hope" that Savage would testify, that "it would be nice" if he did so, but that they "did not have to hear from him," Juror #5's expression of an "expect[ation]" did not indicate a belief that Savage was obligated or required to testify.

16

thinking that [defendant] was guilty" if he did not testify.  *Id.* at 856.  We refused to find plain error in the circuit court's failure to strike the venireperson, because she "ultimately stated that he would not 'hold it against' [the defendant] if he did not testify."  *Id.* at 857.  Juror #5 gave the same unequivocal assurance in this case – twice.  Juror #5 clearly stated that they could serve impartially and without bias, notwithstanding a hope and desire that Savage would testify.

This case stands in sharp contrast to *Kalter*, in which the Southern District found reversible error in the circuit court's failure to strike two potential jurors for cause.  In *Kalter*, the two jurors in question indicated that they would "need" to hear from the Defendant "and that they would 'get both sides if [they] could hear from him.'"  442 S.W.3d at 138 (alteration in original).  The Southern District concluded:

> Those un-rehabilitated responses rendered them unqualified to serve as jurors, and the trial court therefore erred in refusing Defendant's request that they be stricken for cause.  The error was prejudicial because Defendant did not testify, and these two venirepersons – who "need[ed]" that to happen – served on the jury that convicted him.

*Id.* (alteration in original)

The *Kalter* court reasoned that *"'[n]eed' is the language of requirement; it does not suggest mere curiosity or preference*."  *Id.* at 137 (emphasis added).  In this case, however, Juror #5 explicitly disavowed any <u>need</u> to hear from Savage, instead merely stating that they "hope[d]" and "expect[ed]" to hear from him, and that "it would be nice" if Savage would testify.  Juror #5's responses "suggest mere curiosity or preference," not a requirement.  In light of their further statements by Juror #5 that they could be fair and impartial, and would not hold Savage's silence against him, the circuit court was not required to strike Juror #5 for cause.

Savage also emphasizes that, <u>after</u> stating that they would not hold Savage's failure to testify against him, Juror #5 <u>then</u> stated that they "expect[ed]" Savage to testify.  Savage argues that rehabilitation of a venireperson can occur only after the

statements indicating potential bias are made. Because no further inquiry was conducted after Juror #5 indicated that they "expect[ed]" Savage to testify, Savage argues that reversal is required. We disagree. Caselaw clearly holds that a venireperson's qualifications to serve "must be determined on the basis of the entire examination and not just a single response." *Grondman*, 190 S.W.3d at 498. All of the discussion with Juror #5 concerning a defendant's failure to testify occurred in a single colloquy. The circuit court did not abuse its "wide discretion" in concluding that Juror #5 was adequately rehabilitated, even though Juror #5 restated their "expect[ation]" that Savage would testify after stating unequivocally that they would not hold it against Savage if he did not. *See Patton v. Yount*, 467 U.S. 1025, 1039-40 (1984) (noting that, in evaluating challenges for cause to venire members, "[t]he trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading"; stating that "we cannot fault the trial judge for crediting [a venire member's] earliest testimony, in which she said that she could put her opinion aside '[i]f [she] had to,' rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have").

Point I is denied.

## IV.

In his second Point, Savage argues the trial court erred by allowing the victim to testify during the State's case-in-chief about the emotional impact of the burglary.

At trial, the following exchange occurred during the victim's direct examination:

> [Prosecutor]: It wasn't pleasant to be a burglary victim?
>
> [Victim]: No.
>
> [Prosecutor]: But was this an event that ruined your life?

18

[Victim]: It's changed me and made me even more hypersensitive than I used to be. I mean, it's – I certainly don't feel the same. I mean, you know, it was kind of an eye-opening experience.

Defense counsel objected at this point, arguing that "[v]ictim impact evidence is not evidence" and "is not relevant." Defense counsel did not ask the court to strike the victim's testimony. The circuit court overruled Savage's objection.

Savage did not preserve his objection to the victim's testimony, and is entitled to only plain error review. "An objection which is made after the question has been asked and answered is untimely, and, in the absence of a motion to strike the answer, the ruling of the trial court on the objection is not preserved for appellate review." *State v. Smith*, 90 S.W.3d 132, 139 (Mo. App. W.D. 2002) (quoting *State v. Malone*, 951 S.W.2d 725, 729 (Mo. App. W.D. 1997)).[5]

"Claims that are not preserved may be reviewed in the discretion of this Court for plain error." *State v. Taylor*, 466 S.W.3d 521, 533 (Mo. 2015) (citing Rule 30.20). "Plain error is found when the alleged error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice occurred." *Id.* (citation and internal quotation marks omitted). "Such errors must be evident, obvious, and clear." *Id.* (citation and internal quotation marks omitted).

Savage does not request plain-error review, and no manifest injustice or miscarriage of justice appears. The victim's challenged testimony was very brief, and was not referenced during the remainder of the trial. Moreover, that testimony was plainly intended by the prosecution to respond to Savage's suggestion that police had handled the case differently, and felt additional pressure to find a culprit, because of the victim's status as a senior officer in the Kansas City Police

---

[5]     An exception to this general rule exists "'when a party is not given the opportunity to voice an objection because of a quick response by the witness.'" *Smith*, 90 S.W.3d at 139 (quoting *State v. Decker*, 591 S.W.2d 7, 11 (Mo. App. E.D. 1979)). Another exception exists when "the grounds for the objection become apparent only when the answer is given." *State v. Blurton*, 484 S.W.3d 758, 774 (Mo. 2016) (citations omitted). Savage does not contend that either exception applies.

19

Department.  The defense sounded this theme as early as its opening statement. Defense counsel emphasized to the jury that the victim reported the burglary over his police radio rather than by calling 911, and that the victim's alert caused a "swarm of police officers" to descend on the scene.  "You'd think that someone had been murdered."  Defense counsel argued that "when a police officer, when a [senior officer] is the victim, when one of their own is the victim, someone's got to pay. Cases like this, high profile cases . . ., someone's got to pay."

Immediately prior to the challenged testimony, the prosecutor asked the victim whether he had demoted or fired anyone because Savage was not arrested until a month after the burglary; whether the victim was involved in the investigation, or interviewed witnesses or neighbors; and whether he had communicated with or put pressure on anyone in the Police Department Laboratory.  Ironically, in the exchange which Savage contends was designed to elicit jury sympathy by showing how severely the victim had been affected, it is evident that the prosecution was attempting to show the opposite – that the burglary had _not_ significantly impacted the victim – to bolster its argument that the victim had not improperly influenced the investigation, or pressured the investigating officers.

The circuit court did not plainly err by failing to intervene to prevent the victim's challenged testimony, or by failing to strike that testimony *sua sponte*. Point II is denied.

## V.

In Points III and IV, Savage argues that the trial court erred by ordering that he pay $4,711.54 in restitution.  Savage argues that the restitution award is improper because the jury convicted him only of the lesser misdemeanor offense of stealing a television with a value in excess of $150, but not of the greater offense of

20

stealing a television with a value above $750. Savage also argues that the amount of restitution is not supported by the evidence.

We review a circuit court's sentencing decisions for an abuse of discretion. *State v. Fleming*, 541 S.W.3d 560, 562 (Mo. App. W.D. 2018).

Savage was charged with two counts. Count I alleged that Savage committed the class D felony of second-degree burglary by "knowingly enter[ing] unlawfully in an inhabitable structure . . . for the purpose of committing a stealing therein." In Count II, Savage was charged with felony stealing for "appropriat[ing] a Samsung television of a value of at least seven hundred fifty dollars."

At trial, the victim testified that a back "doorjamb [in his home] had been shattered," and the wall cracked above the door. The victim also testified that a 55-inch Samsung television had been removed. He testified that he had paid "around $1,700" for the television, that the television was undamaged and in working order, and that he believed the television's market value at the time of the theft was "13, $1,400 still." In addition, the victim testified that several rings, necklaces, and a "Bose stereo" were all missing.

On Count II, the circuit court instructed the jury that to find Savage guilty of felony stealing, it had to find that he "took a Samsung television," and that "the property so taken had a value of at least $750." The court also instructed the jury on the lesser-included offense of misdemeanor stealing, which would require them to find that Savage "took a Samsung television," and "that the property so taken had a value of at least $150." The jury found Savage guilty of second-degree burglary and the lesser offense of misdemeanor stealing.

At sentencing, the victim's wife testified as follows:

> [Prosecutor]: . . . What property was taken from you then?
>
> [Victim's wife]: Besides a television set, probably the property that was the most important to me, engagement ring from my

21

husband, wedding rings, mother's ring from my daughter's personal jewelry –

. . . .

[Prosecutor]: What was the approximate monetary value of those items?

[Victim's wife]: My husband could probably testify better purchase price. None of the items are replaceable simply for sentimental value, but probably several thousand dollars.

In addition, the victim testified that he "submitted a claim to the prosecutor's office of $4,771.54" that represented "the amount of [his] loss" "[t]hat was not covered by insurance." The victim did not provide any detail concerning the manner in which he had calculated the amount of restitution he was requesting.

The circuit court awarded restitution of $4,711.54 as part of Savage's sentence for burglary. The court explained that it did not believe it was limited to the value of the television found by the jury on the stealing count:

In my opinion, the Defendant was charged with a burglary. He doesn't have to be charged with everything that he stole out of there for the victims to get restitution for those items that are stolen.

While the jury found that the television itself was under a certain amount, I don't think that prohibits restitution being requested by the victim for all the items that were taken out of the home.

Section 559.105.1 provides in relevant part that "[a]ny person who has been found guilty of or has pled guilty to an offense may be ordered by the court to make restitution to the victim for the victim's losses due to such offense." The "plain and unambiguous meaning of the phrase 'due to' is 'because of.'" *State ex rel. Bowman v. Inman*, 516 S.W.3d 367, 369 (Mo. 2017) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 699 (2002)). "Thus, to meet the causation requirement necessary to support a restitution order, the evidence must quantify the victim's losses that are *because of* the offense." *State v. Garcia*, 587 S.W.3d 688, 695-96 (Mo. App. W.D. 2019).

22

Here, Savage was found guilty of two offenses: second-degree burglary and misdemeanor stealing. At the time of the offense, second-degree burglary was defined as: "knowingly enter[ing] unlawfully or knowingly remain[ing] unlawfully in a building or inhabitable structure for the purpose of committing a crime therein." § 569.170. The circuit court ordered restitution as part of Savage's sentence for the burglary conviction. While the offense of burglary does not require, as an element, that a crime actually be consummated following the defendant's unlawful entry, the victim suffered property damage to his home, and the loss of multiple pieces of unrecovered property (including a television, jewelry, and stereo equipment) "due to" or "because of" the burglary. *Cf. Fleming*, 541 S.W.3d at 563 (recognizing court could order restitution on second-degree burglary conviction for the amount of checks which were stolen from the burglary victim and fraudulently cashed following burglary). The losses suffered "due to" or "because of" the burglary are not limited to the specific loss separately charged as a stealing; indeed, it was not necessary for the State to charge Savage separately with *any* stealing offense in order to sustain Savage's conviction, and the restitution order, on the burglary charge.[6]

Next, we consider Savage's argument that the amount of restitution ordered ($4,711.54) is not supported by the evidence. To preserve a claim of sentencing error, including imposition of restitution, a defendant must object at the sentencing

---

[6] While unnecessary to our disposition, we question Savage's claim that, by convicting him of misdemeanor stealing, the jury necessarily found that the television he stole had a value of less than $750. The verdict director for misdemeanor stealing only required the jury to find that the television had a value of more than $150. While the jury did not convict of the greater offense of felony stealing (which required that the television have a value of at least $750), the jury's failure to convict on the greater offense does not mean that they necessarily found that the television was worth less than that threshold. *See, e.g., Tisius v. State*, 183 S.W.3d 207, 217 (Mo. 2006) ("Missouri's instructions on lesser-included offenses do not require that the defendant first be acquitted of the greater offense before the jury can consider the lesser offense."); *State v. Johnson*, 599 S.W.3d 222, 226 (Mo. App. W.D. 2020).

hearing. *State v. Garcia*, 587 S.W.3d at 695 (reviewing a claim that the amount of restitution was unsupported by the evidence solely for plain error, because defendant "did not object to the imposition of restitution at the sentencing hearing"); *State v. Heidbrink*, 546 S.W.3d 597, 604 (Mo. App. E.D. 2018). Savage's only objection to the award of restitution at the sentencing hearing was his claim that the restitution order could not exceed $750 because the jury had convicted him only of misdemeanor stealing – a claim we have rejected above. Savage did not separately object that the amount of restitution was otherwise unsupported by the evidence. We therefore review the evidentiary-sufficiency issue only for plain error.

To impose restitution on a conviction for burglary, the evidence must "quantify[ ] the losses 'due to' [defendant]'s burglary." *Fleming*, 541 S.W.3d at 564; *accord State v. Young*, 582 S.W.3d 84, 97 (Mo. App. E.D. 2019). At the sentencing hearing, the victim's wife testified that in addition to a television, several items of jewelry, including an engagement ring, wedding ring, and anniversary band, had been stolen. At trial, the victim had testified that stereo equipment had also been stolen in addition to the items listed by his wife at the sentencing hearing. Victim's wife testified at sentencing that the stolen items were worth "probably several thousand dollars." More importantly, the victim testified at the sentencing hearing that the amount of his losses, not covered by insurance, was $4,771.54. Although Savage now complains that the victim failed to provide details as to how the total amount of restitution was calculated, he had the opportunity to cross-examine the victim on this point. Moreover, if Savage had objected at the sentencing hearing that the victim's restitution testimony was insufficiently specific, we presume the State would have attempted to cure the defect by eliciting additional testimony before sentence was imposed. Given the testimony concerning the nature of the property which was stolen, as well as the damage to the victim's home, and the

24

testimony from both the victim and his wife concerning the value of that property, we find no plain error in the evidentiary foundation for the restitution award.

Points III and IV are denied.

## VI.

Savage's remaining five Points challenge the circuit court's order that certain costs be taxed against him.

At sentencing, the court ordered that "[c]ourt costs will be taxed against [Savage], as well as a $46 judgment for Crime Victims' Compensation fund." The circuit court granted Savage *in forma pauperis* status for purposes of appeal. Defense counsel objected to the circuit court's taxation of costs against Savage based on his indigent status, arguing that Savage was unemployed, does not have a high school diploma, and was represented by the Public Defender. Defense counsel also argued that costs should not be taxed against Savage when the court was sending a bill of costs to the State for reimbursement. The court overruled Savage's objections. The written judgment reflects that costs were taxed against Savage, as well as a $46 assessment for the Crime Victims' Compensation fund.

The Bill of Costs issued to the Department of Corrections on February 20, 2019 seeks reimbursement of $6.00 as the County portion of the Felony Clerk Fee; a Sheriff's Fee of $75; and costs of incarceration of $6,629.68, for a total of $6,710.68. The court and prosecutor certified in the bill of costs that "the defendant is insolvent."

Savage was ultimately taxed court costs totaling $371.50.

On March 4, 2019, Savage filed a motion to retax costs, asking the court to "correct[ ] the sentence and judgment sheet which purports to tax costs in this matter against Defendant and to replace this with a[n] Order taxing costs in this matter against the State." Savage argued that, because he is indigent, he is exempt from the payment of costs by statute. Savage noted that, in the bill of costs issued

25

to the Department of Corrections, the circuit court and prosecutor had certified that he is insolvent.

The court held a hearing on Savage's motion to retax costs on March 20, 2019. At the conclusion of the hearing, the court noted that Savage is an "able bodied individual who clearly posted a $25,000 bond at one point in time in this case." Notwithstanding his *in forma pauperis* status for purposes of appeal, the court found that he was not unable to pay the court costs, and denied Savage's motion to retax those costs.

In Point V, Savage argues the trial court did not have statutory authority to tax costs against him because he was unable to pay the costs.

Under § 550.010,

> [w]henever any person shall be convicted of any crime or misdemeanor he shall be adjudged to pay the costs, and no costs incurred on his part, except fees for the cost of incarceration, including a reasonable sum to cover occupancy costs, shall be paid by the state or county.

§ 550.010. Section 550.020 provides for the State to pay the costs in certain circumstances. It provides:

> [i]n all capital cases in which the defendant shall be convicted, and in all cases in which the defendant shall be sentenced to imprisonment in the penitentiary . . . the state shall pay the costs, if the defendant shall be unable to pay them, except costs incurred on behalf of defendant.

§ 550.020.1.

The circuit court rejected Savage's claim that he was "unable to pay" court costs. We review a trial court's decisions at sentencing for an abuse of discretion. *State v. Russell*, 598 S.W.3d 133, 136 (Mo. 2020). "An abuse of discretion occurs when the trial court's action is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful consideration." *Id.* At the sentencing hearing, Savage did not present any evidence – testimonial, by affidavit, or otherwise – to establish that he was "unable to pay" the court costs. Instead, he

26

relied on a series of circumstances which, he alleged, established his inability to pay. First, Savage relied on the fact that he had been represented by the Public Defender. The circuit court expressed some skepticism concerning his eligibility for representation by the public defender, however, given that he had posted bond. But in any event, eligibility for the public defender's services is initially made by the public defender, not by the court, § 600.086.3; and eligibility is based on a determination "that the person does not have the means at his disposal or available to him to obtain counsel in his behalf." § 600.086.1. As the circuit court noted, having the financial wherewithal to hire counsel is a different matter from the ability to pay court costs.

The same could be said for Savage's argument that the circuit court acted inconsistently by seeking State reimbursement for Savage's costs of incarceration, while nevertheless taxing certain court costs against him personally: the inability to satisfy a "board bill" of several thousand dollars is a different matter from the ability to pay court costs totaling less than $400. Further, while the sentencing assessment report reflected that Savage did not have a high school diploma, it also indicated that he had been employed in 2017, prior to his arraignment, earning $12 an hour at UPS. On this record, and given the limited information Savage provided to the circuit court at the time of his sentencing, it was not an abuse of discretion for the court to find that Savage had failed to establish that he was unable to pay court costs.[7]

In Point VI and VII, Savage argues that the statutes authorizing seventeen specific items of cost prohibited the taxation of those items against him, because the

---

[7] In his argument under Point V, Savage argues that comments made by the circuit court at the hearing on his motion to retax costs reflected an erroneous view of the law. Be that as it may, as we explain in the text, the trial court's ruling on Savage's motion to retax costs is not before us in this appeal; that ruling was the subject of Savage's earlier appeal, which was decided against him.

27

State is paying the defendant's costs. In Points VIII and IX, he argues that three specific items of cost were erroneously taxed against him because they were assessed twice.

This appeal is not the appropriate vehicle for Savage to challenge specific items of costs which were taxed against him. Under § 514.270, "[a]ny person aggrieved by the taxation of a bill of costs may, upon application, have the same retaxed by the court in which the action or proceeding was had, and in such retaxation all errors shall be corrected by the court." "If a party contests a category or specific item of costs, the remedy is by motion to retax in the court of the alleged error." *Wiley v. Daly*, 472 S.W.3d 257, 265 (Mo. App. E.D. 2015) (quoting *in re J.P.*, 947 S.W.2d 442, 444 (Mo. App. W.D. 1997)). A motion to retax is appropriate to address taxation of court costs alleged to be in error as shown in the party's fee report. *See State v. Richey*, 569 S.W.3d 420, 425-26 (Mo. 2019) (on remand ordering circuit courts to retax costs and remove board bill liability from defendants' fee reports); *State v. Tidwell*, 577 S.W.3d 816, 817 (Mo. App. S.D. 2019) (ordering circuit court to retax costs and remove board bill liability from defendant's fee report). We recognized this principle in Savage's earlier appeal, in which we observed that the decision to allocate responsibility for the payment of costs between Savage and the State "was part of the final judgment subject to appeal, but any subsequent determination as to the amount and types of costs to be assessed could be challenged in a motion to retax costs." *State v. Savage*, 592 S.W.3d 42, 47 (Mo. App. W.D. 2019).

None of the specific items of cost which Savage now challenges were assessed against him in the judgment which is the subject of this appeal. Instead, those items were taxed against Savage months after the entry of judgment.[8] As we

---

[8] Savage himself recognizes as much: his Reply Brief states that "the errors [asserted in Points VI through IX] were not evident until the Bill of Costs and the Case

28

explained in Savage's earlier appeal, any objections which Savage had to the imposition of specific items of cost could – and should – have been raised in Savage's motion to retax costs, and in his earlier appeal of the circuit court's denial of his motion to retax costs.

Besides the fact that this direct appeal is not the appropriate forum in which to challenge the taxation of specific items of cost, we also note that Savage failed to preserve the objections in Points VI through IX in the circuit court. In his motion to retax costs, Savage argued only that costs should not have been taxed against him because he was "unable to pay" those costs within the meaning of § 550.020.1. The arguments in Points VI through IX, alleging that specific items of cost are not statutorily authorized or are duplicative, were never raised in any way before the circuit court, and are all presented for the first time on appeal. "We will not convict a trial court of error for reasons not presented to it and instead argued for the first time on appeal." *State v. West*, 548 S.W.3d 406, 413 (Mo. App. W.D. 2018).

### Conclusion

We affirm the judgment of the circuit court.

_____
Alok Ahuja, Judge

All concur.

---

Party Fee Report were created and filed in March 2019, four months after [the] sentencing hearing" and the entry of the judgment under review.